**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Red River Farms, a California general partnership; Robert Mullion, a California resident; Joe D. McCain, a California resident; Wayne Sprawls Family Trust,<br><br>Plaintiffs,<br><br>vs.<br><br>United States of America; United States Department of Homeland Security; Michael Chertoff, in his official capacity as Secretary of the United States Department of Homeland Security; United States Coast Guard; Admiral Thad W. Allen, in his official capacity as Commandant of the United States Coast Guard; Robert L. Hildebrand, in his official capacity as case officer with the United States Coast Guard; Wayne Hamilton, in his official capacity as case officer with the United States Coast Guard; Miguel Bella, in his official capacity as case officer with the United States Coast Guard,<br><br>Defendants. | No. CV 08-2078-PHX-NVW<br><br>**ORDER** |

Plaintiffs Red River Farms, Robert Mullion, Joe D. McCain, and Wayne Sprawls Family Trust (collectively "Red River") move for summary judgment that Defendants (collectively "the Government") may not collect from them certain removal costs and damages incurred by the Oil Spill Liability Trust Fund because the applicable statute of

limitations has expired. (Doc. # 40.) At this time, the sole issue before the Court is the applicability of the three year statute of limitations on cost recovery actions under the Oil Pollution Act, 33 U.S.C. § 2717(f)(4). Red River filed its motion before the Government filed the administrative record in this case. The parties stipulated that further motions for summary judgment based on the administrative record would take place only if the Court denied Red River's motion for summary judgment on the statute of limitations. (Doc. ## 44, 45.) The Court will therefore limit its discussion to those facts bearing on the statute of limitations issue.

**I.  Background**

On January 5, 2002, diesel fuel from a fuel line to an irrigation pump on Red River property leaked onto the surrounding ground. Some of the fuel ultimately discharged into the Colorado River. Several federal and state agencies responded to the fuel leak. On September 5, 2002, the United States Coast Guard's National Pollution Fund Center ("NPFC") paid $136,578.60 from the Oil Spill Liability Trust Fund to reimburse federal and state agencies that responded to the spill. The NPFC contacted Plaintiff Robert Mullion on February 22, 2003, and notified him of his potential liability for the response costs. After reviewing information provided in response to the notification, the NPFC concluded that Plaintiff Mullion was responsible for the costs and issued him a bill on June 11, 2003. NPFC issued bills for the same amount to Plaintiff Joe D. McCain and Harold Wayne Sprawls on September 3, 2003. Neither Plaintiff Mullion, nor Plaintiff McCain, nor Mr. Sprawls paid the bills. Several years passed.

On February 10, 2006, NPFC sent a bill to the Wayne Sprawls Family Trust, explaining that the previous bill had mistakenly been addressed to Mr. Sprawls himself. Wayne Sprawls Family Trust did not pay the bill. On June 15, 2006, NPFC referred Plaintiffs Mullion, McCain, and Wayne Sprawls Family Trust to the Department of Treasury's Debt Management Services ("DMS") for collection.

1  NPFC sent a bill for the response costs to Plaintiff Red River Farms on October 9,
2  2007. Red River Farms did not pay the bill. On April 3, 2008, NPFC referred Red River
3  Farms to DMS for collection.

**II.    Analysis**

    **A.    The Oil Pollution Act, 33 U.S.C. §§ 2701–2762**

The Oil Pollution Act ("OPA"), passed following the 1989 Exxon Valdez tanker disaster, created "a more comprehensive compensation and liability scheme for oil spill pollution than had existed under earlier legislation." *Matter of Metlife Capital Corp.*, 132 F.3d 818, 820 (1st Cir. 1997). The OPA imposes strict liability for oil pollution removal costs and damages on the "responsible party":

> [E]ach responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages specified in subsection (b) that result from such incident.

33 U.S.C. § 2702(a); *Metlife Capital*, 132 F.3d at 820-21. The OPA defines the "responsible party" for a pipeline as "any person owning or operating the pipeline." 33 U.S.C. § 2701(32)(E). In the case of an onshore facility other than a pipeline, the "responsible party" is "any person owning or operating the facility," with some exceptions not relevant here. Thus, under the OPA, the owner or operator of a pipeline or onshore facility is presumptively liable for oil spill removal costs and damages.

The OPA provides that a third party or parties will be treated as the "responsible party or parties" if a "responsible party" establishes, by a preponderance of the evidence, that a discharge and the resulting removal costs and damages were caused solely by a third party or parties. 33 U.S.C. §§ 2702(d)(1)(A), 2703(a)(3). The "responsible party" must also establish, by a preponderance of the evidence, that the responsible party "exercised due care with respect to the oil concerned" and "took precautions against foreseeable acts or omissions of any such third party and the foreseeable consequences of those acts or omissions." 33 U.S.C. § 2703(a)(3).

1  Alternatively, if the "responsible party" alleges that the discharge was caused
2  solely by an act or omission of a third party, the "responsible party" "shall pay removal
3  costs and damages to any claimant" and "shall be entitled by subrogation to all rights of
4  the United States Government and the claimant to recover removal costs or damages from
5  the third party or the [Oil Spill Liability] Fund paid under [the OPA]." 33 U.S.C.
6  § 2702(d)(1)(B).

7  Federal or state agencies that incur costs to remove oil pollution may claim those
8  costs from the Oil Spill Liability Trust Fund ("the Fund"). 33 U.S.C. § 2712(a)(1); *see*
9  *also* § 1321(s). When the Fund pays compensation to claimants, it becomes subrogated to
10 "all rights, claims, and causes of action" held by the federal or state agency against the
11 responsible party. 33 U.S.C. § 2715(a). At the request of the Secretary, the Attorney
12 General "shall commence an action on behalf of the Fund" against any responsible party
13 "for the cost or damages for which compensation was paid." 33 U.S.C. § 2715(c).
14 Although the Attorney General is required to commence an action on behalf of the Fund
15 "at the request of the Secretary," the OPA does not require the Secretary to request the
16 Attorney General to commence an action each time the Fund pays compensation to
17 claimants. If any such action is commenced, however, it must be done within "3 years of
18 the payment of such claim." 33 U.S.C. § 2717(f)(4).

19 **B.    The Debt Collection Improvement Act of 1996, 31 U.S.C. §§ 3701–3733**

20 The Debt Collection Improvement Act of 1996 ("DCIA") provides an
21 administrative offset mechanism through which the Government may collect debts. The
22 DCIA provides that "[i]f a nontax debt or claim owed to the United States has been
23 delinquent for a period of 180 days," the head of the executive agency responsible for the
24 debt or claim "shall transfer the debt or claim to the Secretary of the Treasury" for
25 collection. 31 U.S.C. § 3711(g)(1). The Treasury may collect the debt through
26 administrative offset, 31 U.S.C. § 3716(a), unless "a statute explicitly prohibits using
27 administrative offset or setoff to collect the claim or type of claim involved," 31 U.S.C.
28 § 3716(e)(2). Administrative offset is defined as "withholding funds payable by the

United States . . . to, or held by the United States for, a person to satisfy a claim." 31 U.S.C. § 3701(a).

### C. The OPA's Three-Year Limitation on Actions Does Not Limit Collection of Removal Costs and Damages by Administrative Offset Under the DCIA.

NPFC compensated the federal and state agencies that responded to the spill at Red River Farms on September 5, 2002. It is therefore undisputed that the statute of limitations has long since run on any "action" by the Attorney General to recover the removal costs from Red River. The crux of the dispute is whether the Government may still pursue an administrative means of collecting the removal costs, such as the administrative offset mechanism provided by the DCIA.

The OPA's three-year statute of limitations on "actions" by the Attorney General does not apply to administrative offsets by the Treasury under the DCIA. "The term 'action,' standing alone, ordinarily refers to a judicial proceeding," not an administrative collections mechanism. *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 93 (2006). "[T]he fact that the statute of limitations bars a government suit to collect an amount due to it does not bar the government from invoking its administrative remedies to offset the indebtedness against other claims by the debtor." *Doko Farms v. United States*, 956 F.2d 1136, 1140 (Fed. Cir. 1992); *see also id.* at 1142–43 (relying in part on 31 U.S.C. § 3716). Moreover, the DCIA itself specifies that "[n]otwithstanding any other provision of law, regulation, or administrative limitation, no limitation on the period within which an offset may be initiated or taken pursuant to this section shall be effective." 31 U.S.C. § 3716(e)(1). Thus, there is no time limit on the Government's ability to recover removal costs from Red River by administrative offset.

Also, there is no requirement that the Government sue Red River before it resorts to administrative offset. The DCIA is Congress's most recent addition to a long line of statutes that have increased federal agencies' ability to collect debts without the need for judicial action. *See Lawrence v. Commodity Futures Trading Com.*, 759 F.2d 767, 772 (9th Cir. 1985) ("The provisions of the [Federal Claims Collections Act of 1966] and the

amendments in the Debt Collection Act of 1982 express a Congressional mandate that agencies play a more active role in the collection of delinquent claims than merely referring them to the Department of Justice."). Even before the amendments effectuated by the DCIA, the "argument that mediation or direct suit must precede use of an administrative offset ha[d] no basis in statute or regulation." *McCall Stock Farms v. United States*, 14 F.3d 1562, 1570 (Fed. Cir. 1993) (applying the Debt Collection Act of 1982). The DCIA was enacted to further "maximize collections of delinquent debts owed to the Government by ensuring quick action to enforce recovery of debts and the use of all appropriate collection tools." Debt Collection Improvement Act of 1996, Pub. L. No. 104-138, § 31001(b)(1), 110 Stat. 1321, 1321-358 ("Purposes of 1996 Amendments" note following 31 U.S.C. § 3701).

Removal costs owed by responsible parties under the OPA can be "debts" under the DCIA, even without an "action" by the Attorney General. The DCIA defines a "debt" to be "any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States by a person, organization, or entity other than another Federal agency." 31 U.S.C. § 3701(b)(1). The statute does not explicitly define who qualifies as "an appropriate official of the Federal Government." However, it does provide that the "head of an executive, judicial, or legislative agency" can collect a debt by administrative offset after following certain procedures, including providing "an opportunity for a review within the agency of the decision *of the agency* related to the claim." 31 U.S.C.§ 3716(a)(3) (emphasis supplied). The DCIA therefore contemplates that an agency official may decide whether or not funds or property are owed to the United States, thereby establishing a "debt," without resorting to judicial action.

The Treasury's regulations reinforce that no judicial action is required before an agency may resort to administrative offset. The regulations specify that so long as a debt is "legally enforceable" and the DCIA's procedural requirements have been observed, the debt may be collected through administrative offset. 31 C.F.R. § 285.5(d)(3), (6).

"Legally enforceable" simply means that "there has been a final agency determination that the debt, in the amount stated, is due, and there are no legal bars to collection by offset." 31 C.F.R. § 285.5(b). The requirement that there be no "legal bars" does not mean that collection by offset must take place within a specified time period because, as discussed above, no limitations period applies to administrative offsets. *See* 31 U.S.C. § 3716(e)(1). Rather, the "legal bars" language refers to other prohibitions on collection through offset, such as "debts subject to the automatic stay in bankruptcy proceedings or debts covered by a statute that prohibits collection of such debt by offset." 31 C.F.R. § 285.5(b).

No provision of the OPA explicitly forecloses collection of removal costs through administrative offset. NPFC administers the Fund and therefore has authority to determine whether removal costs are owed to the Government. When NPFC determined that Red River owed removal costs, those removal costs became a debt under the DCIA. Once Red River's debt was 180 days delinquent and NPFC had fulfilled the procedural requirements, it could refer Red River's debt to the Treasury for collection through administrative offset, even though the statute of limitations had expired on a recovery "action" by the Attorney General.

The Court is mindful that this rule of decision will fall harshly on some people. But this is the handiwork of Congress, and it is for Congress to improve upon it.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment (doc. # 40) is denied.

DATED this 16th day of September, 2009.

_____
Neil V. Wake
United States District Judge